UNITED STATES *v.* FRANK SAMUEL & Co. (No. 4108)[1]

United States Court of Customs and Patent Appeals, April 25, 1938

*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney, and *James F. Donnelly,* junior attorney, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Allerton deC. Tompkins* of counsel) for appellee.

[Oral argument February 9, 1938, by Mr. Weil and Mr. J. Stuart Tompkins]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:[2]

This is an appeal from a judgment of the United States Customs Court, Second Division, holding an alloy used in the manufacture of iron and steel, consisting of iron, 29.55 per centum manganese, .3.52 per centum carbon, and 6.80 per centum silicon, dutiable as "spiegeleisen containing more than 1 per centum of carbon" at 75 cents per ton under paragraph 301 of the Tariff Act of 1930, as claimed by the importer, the appellee, rather than as an alloy, not specially provided for, used in the manufacture of iron or steel, at 25 per centum ad valorem under paragraph 302 (o) of that act, as assessed by the collector at the port of Boston, Mass.

The provisions in question read:

PAR. 301. Iron in pigs and iron kentledge, $1.12½ per ton; spiegeleisen containing more than 1 per centum of carbon, 75 cents per ton; granular or sponge iron, $2.25 per ton; wrought and cast scrap iron, scrap steel, hammer scale, roll scale, and mill scale, 75 cents per ton: *Provided,* That spiegeleisen for the purposes of this Act shall be an iron manganese alloy containing less than 30 per centum of manganese: *Provided further,* That nothing shall be deemed scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to be remanu-

---

[1] T. D. 49574.

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

factured: *Provided further*, That an additional duty of $1 per pound on the vanadium content in excess of one-tenth of 1 per centum, 72 cents per pound on the tungsten content in excess of two-tenths of 1 per centum, 65 cents per pound on the molybdenum content in excess of two-tenths of 1 per centum, and 3 cents per pound on the chromium content in excess of two-tenths of 1 per centum, shall be levied, collected, and paid on all the foregoing.

PAR. 302. (o) All alloys used in the manufacture of steel or iron, not specially provided for, 25 per centum ad valorem.

It clearly appears from the record that the imported merchandise contains more than 1 per centum of carbon and less than 30 per centum of manganese.

Evidence was introduced by appellee in an endeavor to establish that the involved merchandise is covered by the statutory term 'spiegeleisen.'.'

Counsel for the Government, on the other hand, although conceding that the commercial meaning of the term "spiegeleisen" is the same as its common meaning, attempted to establish that the imported merchandise did not come within "the trade" understanding of that term, and, therefore, was not the alloy intended by the Congress to be covered by the provisions of paragraph 301, *supra.*

The issue in the case is whether the presence of 6.80 per centum silicon controls the tariff classification of the imported alloy.

Counsel for the Government contend that, due to so large a percentage of silicon, the merchandise is a silicon iron manganese alloy, not an iron manganese alloy; that it is a separate and distinct alloy known as "silico-spiegel," and is used for its silicon and manganese content in making certain grades of steel; whereas, "spiegeleisen" is used for its manganese content in making other grades of iron and steel.

Generally speaking, the witnesses for the Government were of opinion that the maximum percentage of silicon in spiegeleisen was about 3 per centum, and that the involved alloy was silico-spiegel, not spiegeleisen.

The witnesses for the importer, on the other hand, were of opinion that the minimum silicon content of silico-spiegel was approximately 10 per centum, and that the involved alloy, therefore, was spiegeleisen, an iron manganese alloy.

In its decision the trial court carefully analyzed the evidence of record and held that it had been established that the imported merchandise was an "iron manganese alloy"; that it contained less than 30 per centum of manganese, and more than 1 per centum of carbon; and that it was spiegeleisen, and, accordingly, found it to be dutiable as such under paragraph 301, *supra.*

Following its review of the evidence and its findings of fact the court stated that the issues in the case were controlled by this court's decision in the case of *United States* v. *Baltimore & Ohio R. R. Co.,*

16 Ct. Cust. Appls. 180, T. D. 42810, wherein it was held that an alloy containing 77.7 per centum of manganese and more than 1 per centum of carbon, conceded by the parties in that case to be an "iron manganese alloy," was dutiable as "ferromanganese" at 1⅛ cents per pound on the metallic manganese content thereof under paragraph 302 of the Tariff Act of 1922. In so holding, the court said, *inter alia:*

It should be observed that paragraph 518 of the Tariff Act of 1913 provided for "ferromanganese," without any words of limitation, description, or definition, while paragraph 302 of the Tariff Act of 1922 provides for "ferromanganese containing more than 1 per centum of carbon, 1⅛ cents per pound on the metallic manganese contained therein: *Provided*, That ferromanganese for the purpose of this act shall be such iron manganese alloys as contain 30 per centum or more of manganese." It seems to us since this is, admittedly, an iron manganese alloy, and since it contains 77.7 per centum of manganese and contains more than 1 per centum of carbon, that Congress has fixed its own definition of ferromanganese, as far as the issues of this case are involved, and that, by congressional mandate, the importation must be classified as such.

It is argued by counsel for the Government that the issues in the instant case differ from those in the *Baltimore & Ohio R. R. Co.* case, *supra,* in that, in the instant case, counsel for the Government challenge the finding of the trial court that the involved alloy is an "iron manganese alloy"; whereas, in the *Baltimore & Ohio R. R. Co.* case, *supra,* it was conceded that the alloy there involved was an "iron manganese alloy"; and that, as the provisions for "spiegeleisen" in paragraph 301, *supra,* do not include an *iron silicon manganese* alloy (which they claim the involved merchandise to be), but are limited to *iron manganese* alloys, the decision in that case is not controlling of the issues in the instant case.

At the time H. R. 2667 (which later became the Tariff Act of 1930) was under consideration, our decision in the *Baltimore & Ohio R. R. Co.* case, *supra,* was called to the attention of the Congress by the Tariff Commission (Summary of Tariff Information, 1929, Vol. 1, p. 626); nevertheless, the provisions for "ferromanganese," contained in paragraph 302 of the Tariff Act of 1922, under consideration in that case, were re-enacted as paragraph 302 (d) of the Tariff Act of 1930. If the word "spiegeleisen" is substituted for the word "ferromanganese," those provisions are not substantially different from the provisions for "spiegeleisen" contained in paragraph 301, *supra,* here under consideration, except as to the specified percentage of manganese—ferromanganese containing more, and spiegeleisen less, than 30 per centum.

We are in agreement with the views of counsel for the Government that, if the involved merchandise is not an "iron manganese alloy," it is not "spiegeleisen" as defined by the Congress in the provisions under consideration.

It clearly appears from the evidence that "ferromanganese" and "spiegeleisen" are *iron manganese* alloys, and that silico-spiegel is *not* an iron manganese alloy but an *iron silicon manganese* alloy. Accordingly, if the finding of the trial court that the involved alloy is an iron manganese alloy is contrary to the weight of the evidence, the decision in the *Baltimore & Ohio R. R. Co.* case, *supra*, is not controlling of the issues here presented, and the judgment should be reversed. If the finding of the court in that respect is not contrary to the weight of the evidence, and we have reached the conclusion that it is not, the decision in the *Baltimore & Ohio R. R. Co.* case, *supra*, is, in principle, controlling of the issues in this case, and the judgment should be affirmed.

The witnesses for the importer were Samuel A. Cochran, vice president of the appellee company, and Radclyffe Furness, employed by the Midvale Co. (one of the largest steel companies producing "high grade material," such as, "Railroad ties, heavy forgings of all descriptions for turbine generators, ordnance, armour plate, projectiles") as superintendent of "all melting and forging."

The witness Cochran testified that his company had been engaged for many years in the handling of "all ores and alloys and many raw materials used in the manufacture of iron and steel"; that for more than thirty years he had handled spiegeleisen, silico-spiegel, ferromanganese, and ferrosilicon in large quantities; that, although he had studied metallurgy in high school and at Drexel Institute, he had specialized in chemistry, and his knowledge of metallurgy had been acquired from practical experience in iron and steel mills; that he had been employed for a number of years by the Pencoyd Iron Works as chemist and assistant superintendent in the steel department; and that he ordered the involved merchandise in accordance with certain specifications.

The specifications referred to by the witness appear in Exhibit 2, which was introduced in evidence by counsel for the Government. We quote the pertinent part thereof: "Quantity, Approx. 600 tons Spiegeleisen, analyzing: Manganese 26–29%, Silicon 6–8%."

The witness stated that the involved merchandise was sold as spiegeleisen by appellee to the Griffin Wheel Co., Chicago, Ill. Relative to silico-spiegel and spiegeleisen, he said that the *maximum* amount of silicon in speigeleisen was about 10 per centum, and the *minimum* amount in silico-spiegel was the same, and that all spiegeleisen contains some silicon, which, he said, varies "according to specifications." He identified Exhibit 1, entitled "Standard Specifications for Spiegeleisen," apparently prepared in 1927 by the "American Society for Testing Materials," which society, according to the testimony of the witness, was composed of "most steel makers and most testing agencies." (It appears from that exhibit that,

although the maximum percentages of manganese, carbon, phosphorus, and sulfur are specified therein, the maximum percentage of silicon is to be specified in the order.) He also identified Exhibits 3 and 4.

Exhibit 3 is an excerpt from a book entitled "The Metallurgy of Steel," by Henry Marion Howe, published in 1892. It appears therefrom that silico-spiegel contains from 10.30 to 17 per centum silicon.

Exhibit 4 is a communication, dated June 24, 1932, from the Acting Commissioner of Customs, Washington, D. C., to the United States Appraiser of Merchandise, Boston, Mass., and has reference apparently to the dutiable status of the involved merchandise. The exhibit contains, in substance, the statement that the appraiser at the port of New York was of opinion that "an iron manganese alloy" containing more than 4 per centum of silicon was not spiegeleisen.

That exhibit, standing alone, is of no value as evidence in the case. However, the witness Cochran was permitted to say that he agreed with the statement alleged to be contained therein that the involved merchandise was "an iron manganese alloy." (Although that testimony was objected to by counsel for the Government, its admission in evidence by the trial court is not assigned as error here.) He further testified that the involved merchandise is spiegeleisen, and that spiegeleisen is an iron manganese alloy; that, although the imported merchandise is spiegeleisen of a high silicon content, the values of spiegeleisen, whether of high or low silicon content, are practically the same.

The witness Furness, eminently qualified to speak authoritatively on the subject of alloys used in the manufacture of iron and steel, said that silico-spiegel is an iron silicon manganese alloy; that its minimum silicon content is about 10 per centum; that the maximum silicon content of spiegeleisen is about 10 per centum; that an iron manganese alloy containing less than 30 per centum of manganese and about 1 per centum of silicon is spiegeleisen with a low silicon content; that the involved alloy is spiegeleisen with a high silicon content; that the low and high silicon spiegeleisen are not the same alloys as silico-spiegel, which has a higher silicon content, and is used for a different purpose; and that, although he had been using spiegeleisen for many years, he had not used silico-spiegel for from twenty to twenty-five years because, he said, it did not meet the requirements of his company's process. He said, however, that he had kept in touch with the trade and knew the trade understanding of silico-spiegel, stating that one could not "go to sleep in the steel business; you have to keep in touch with all alloys used."

It is unnecessary to give a full analysis of the testimony and the exhibits introduced by the Government. Practically all of the Govern-

ment's evidence, relative to the percentages of silicon contained in spiegeleisen and silico-spiegel, relates to the *standard* or the *usual* specifications as to the silicon content of those products.

There is testimony which tends to support the argument of counsel for the Government that an alloy, such as that here involved, which contains more than 3 to 5 per centum of silicon, is known in the trade as silico-spiegel.

There are some discrepancies in the statements of some of the Government witnesses, which might have been given consideration, and properly so, by the trial court; for example, the witness Roser, secretary and assistant sales manager of the Electro Metallurgical Sales Corporation, which corporation is engaged in selling ferro-alloys to the steel trade, testified, on cross-examination, as follows:

X Q. Have you ever had or known of silico-spiegel with less than six percent silicon?—A. No, sir.

He later stated, however, that if the silicon content were more than 3 per centum the alloy would be called silico-spiegel. He identified Exhibit D, a catalog published by his company in 1925.

That exhibit states a "Typical analysis" of silico-spiegel, so far as the silicon content is concerned, to be 6 to 8 per centum.

The witness Roser also identified Collective Illustrative Exhibit E, which consists of three of his company's invoices of silico-spiegel. The invoices are dated, respectively, December 3, 1925, August 8, 1928, and August 13, 1928. The merchandise is referred to in each as silico-spiegel, and the silicon content of such merchandise is stated, respectively, to be 9.10, 8.03, and 8.03 per centum.

If an alloy containing as little as 3 per centum of silicon, or, as in the instant case, 6.80 per centum, is silico-spiegel within the understanding of the trade, the natural inquiry is: Why was the Government content to introduce invoices of that alloy showing a silicon content of 8.03 and 9.10 per centum? It would seem that other invoices might have been introduced, which would have given a more practical illustration of the correctness of the Government's position.

We do not wish to be understood as expressing any view as to the line of demarcation between spiegeleisen and silico-spiegel. However, we are unable to hold, on the record before us, that the trial court's finding that the involved merchandise was spiegeleisen—an iron manganese alloy—is contrary to the weight of the evidence.

We conclude, therefore, that the decision in the *Baltimore & Ohio R. R. Co.* case, *supra*, is controlling in principle of the issues in the case at bar.

Judgment *affirmed*.